Irvin et al., Appellants, *v.* Plymouth Meeting Rubber Division Linear, Inc.

Argued October 3, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*Alexander F. Barbieri,* for appellants.

*Frank R. Ambler,* for appellee.

OPINION BY WRIGHT, J., November 13, 1956:

This is a workmen's compensation case in which we are concerned with three appeals arising out of the same facts and involving substantially the same ques-

tion. Claimant in his lifetime filed a petition to set aside a final receipt. After his death, claim petitions were filed by the widow, and by the divorced former wife on behalf of the minor children. All three petitions were dismissed by the Referee, and the Board affirmed. Upon appeal to the Court of Common Pleas, the decisions of the Board were affirmed. These appeals to the Superior Court followed.

William J. Irvin commenced work for Plymouth Meeting Rubber Division Linear in January 1950. On April 6, 1950, he fell, striking his head and severely lacerating his scalp. Paragraph seven of the compensation agreement describes the accident as follows: "While operating cutting machine, claimant suffered a fainting spell and fell to the ground, and sustained scalp lacerations". After treatment in the Montgomery County Hospital, Irvin was discharged on April 12, 1950. Compensation was paid under the agreement for four weeks, from April 14, 1950, to May 11, 1950, when a final receipt was executed. Irvin never returned to work. On March 15, 1951, he filed a petition to set aside the final receipt and review paragraph seven of the agreement. Two hearings were held by the Referee. On February 1, 1952, Irvin died. The cause of death was malignant hypertension. After the claim petitions were filed by decedent's widow and his divorced former wife, further hearings were held. On June 21, 1954, the Referee dismissed the petition to set aside the final receipt on the ground that it "was not signed under mistake of fact, nor procured by fraud, coercion, or other improper conduct". On June 22, 1954, the Referee dismissed the dependency petitions, finding as a fact that: "From a preponderance of the medical testimony presented by claimant and defendant in support of their separate allegations, your Ref-

eree is of the opinion and finds as a fact that the death of the decedent on February 1, 1952, was neither caused nor aggravated by the accident of April 6, 1950, but was entirely due to causes unrelated to the accident".

Appellants contentions are all basically grounded upon the proposition that the findings of the compensation authorities were in capricious disregard of the uncontradicted evidence. Their position in this regard is that, when decedent fell on April 6, 1950, he suffered "a serious brain damage condition with concussion and cerebral contusion". The only evidence to support this theory was the record made when decedent was admitted to the hospital. At that time Dr. Joseph A. Brady noted on the case history, "My first impression is cerebral contusion". On the very next day, Dr. Brady noted on the record: "Seems to be free of any intracranial lesion". This second notation was confirmed by the x-rays, which failed to show any evidence of injury or increased pressure in the bones of the cranial vault. Moreover, an autopsy performed on the body of the deceased did not reveal any evidence of trauma. It is significant that Dr. Brady was not called as a witness for appellants. See *Harkins v. Varone,* 306 Pa. 376, 159 A. 860.

Irvin testified that, prior to the accident of April 6, 1950, his general health was all right, that he never consulted a physician, that he was never treated for high blood pressure, and that he never had fainting spells or black-outs. However, the record discloses that he was treated by Dr. Charles W. Gross for hypertension from July 3, 1946 until September 28, 1946, during which period his systolic blood pressure ranged from 190 to 220; that he was examined by Dr. Franklin C. Kelten on September 30, 1948, at which time his systolic blood pressure was 240; that Dr. James G.

Watson commenced treating him for high blood pressure with accompanying dizzy spells on February 4, 1950, and made arrangements for him to attend the cardio-vascular clinic at Temple University. The history at that institution reads "dizzy spells and headaches (began 5 years ago)—then a Dr.'s exam. showed blood pressure at 240 systolic and would stay there unvarying. For a period of 24 years (aged 16) he has noted momentary 'black out' spells followed by severe headaches in occiput". Prior to commencing his employment for appellee, Irvin had not worked for at least four months.

We will briefly detail the medical testimony. Dr. John M. Breck testified at the first hearing that he began treating Irvin for hypertension on April 28, 1950, at which time his systolic blood pressure was 185; that the scalp laceration was then healed, although still "oozing some serous fluid"; that claimant had cerebral accidents, commonly termed strokes, in July, August, and October, 1950; and that the prognosis was poor. Dr. Victor A. Digilio, testifying after Irvin's death upon a hypothetical statement of the evidence, expressed the opinion that, while claimant had hypertension prior to April 6, 1950, it was benign, and that the accident made it malignant. Dr. H. Craig Bell, testifying similarly, stated that the accident aggravated the hypertension, causing "traumatic encephalopathy", and that there was a causal connection between the accident and the death.

On the other hand, Dr. A. M. Ornsteen, who had examined the decedent on June 16, 1951, testified that Irvin had malignant hypertension with encephalopathy, that the disease existed over a long period, was progressive in nature and always fatal, and that its course could not be, and was not in the instant case, altered,

accelerated, or aggravated by the accident. Dr. Benjamin A. Gouley, who had examined Irvin in May 1951, testified to the same effect and concluded that "the accident played no role in this case". It should perhaps be here noted that, according to all the medical testimony, malignant hypertension is a diffuse disease process which causes a pathological degeneration of the blood vessels over the entire body. In this case the autopsy showed serious damage, not only to the brain, but also to the heart, lungs, kidneys, liver, and spleen.

Considering first the petition to set aside the final receipt, we must bear in mind that the credibility of witnesses is always a question for the finders of fact. Even uncontradicted evidence need not be accepted as true: *Kline v. Kiehl*, 157 Pa. Superior Ct. 392, 43 A. 2d 616. Medical testimony may properly be the basis of the Board's decision, notwithstanding the claimant's testimony to the contrary: *Mahoney v. Mulholland Roofing Co.*, 135 Pa. Superior Ct. 498, 5 A. 2d 812. With regard to the testimony given by Irvin himself, it is evident that the compensation authorities were in agreement with appellee's contention that "claimant's credibility was nil". In any event, the testimony in no way established that the final receipt was obtained through fraud, coercion, or improper conduct. Nor was there a mistake of fact. See *Prybish v. Heidelberg Coal Co.*, 159 Pa. Superior Ct. 12, 46 A. 2d 509.

So far as the dependency petitions are concerned, it was of course necessary for claimants to establish a causal connection between the accident and the death. See *Washko v. Ruckno*, 180 Pa. Superior Ct. 606, 121 A. 2d 456. If the testimony as to that causal connection is conflicting, the issue is similarly one of fact for the compensation authorities: *Nelson v. Borough of Greenville*, 181 Pa. Superior Ct. 488, 124 A. 2d 675.

Where a pre-existing ailment is a factor, it must be shown by competent medical evidence, beyond mere conjecture, that the disability resulted from the alleged accident and not from the normal progress of the pre-existing condition: *Patterson v. Philadelphia Dairy Products Co.*, 177 Pa. Superior Ct. 195, 110 A. 2d 797.

Since the decisions of the Board were against the parties having the burden of proof, the question before us is whether the Board's findings of fact are consistent with each other and with its conclusions of law and order, and can be sustained without a capricious disregard of the evidence: *Dandy v. Century House and Window Cleaning Co.*, 179 Pa. Superior Ct. 365, 115 A. 2d 871; *Tallman v. Florey*, 179 Pa. Superior Ct. 354, 115 A. 2d 752. Unless such capricious disregard of relevant credible testimony appears, the findings of fact by the Referee, adopted and affirmed by the Board, based on adequate and competent evidence, will be sustained on appeal: *Cuirgle v. American Radiator & Standard Sanitary Corp.*, 366 Pa. 249, 77 A. 2d 439; *Schaefer v. Central News Co.*, 179 Pa. Superior Ct. 559, 118 A. 2d 268.

We have completely reviewed the record and agree with Judge DANNEHOWER, speaking for the court below, that "there was ample evidence to sustain all the findings of the compensation authorities and we are bound by those findings based on substantial legally competent evidence and must accordingly dismiss the appeals".

Judgments affirmed.